Moncure, P.
This case has been argued very elaborately and ably by the learned counsel on both sides, who have quoted and commented on a great many authorities, but in my view of the case, it will not be necessary to consider many, if any of them, as I think it depends upon facts and principles which admit of little or no controversy. And,
First, in regard to the facts of the case. On the 5th of July 1866, Charles H. Utterback, of the county of Fauquier, Virginia, executed his negotiable note for eleven thousand dollars, payable two years after date, to the order of Edward E. Cooper of the city of Baltimore, at the National bank of Baltimore: and also executed his four other negotiable notes,, each for the sum of three hundred and thirty dollars, payable, respectively, six, twelve, eighteen and twenty-four months after date, to the same order, at the said bank; the said last mentioned sum being the amount of the semi-annual interest on the said first mentioned sum. And on the same day and year the said Charles H. Utterback, by deed bearing the same date, conveyed to Robert W. L. Rasin, of Baltimore, a certain tract of land in said county, containing 312 acres, 2 roods and 34 perches of land, which was *236 conveyed to said Charles by his late father, Armistead Utterback, by deed bearing date on the 2nd day of February 1859, and admitted to record in the clerk’s office of the said county on the following day. Also another tract of land in said county, described in first mentioned deed, as containing 131 acres, 3 roods and 4 poles, in trust to secure tbe payment of the said five negotiable notes.
At the time of the execution of tbe said deed of trust of the 5th day of July 1866, there remained of record in the clerk’s office of the said county of Fauquier, and unreleased, a deed of trust on the said tract of land containing 312 acres, 2 roods and 34 perches, dated the 2d day of February 1859, between said Charles II. Utterback of the first part, John P. Phillips of the second part, and said Armistead Utterterback of the third part; executed to secure the payment of six bonds, each for the sum of $1,042.39 with interest from the 1st day of January, 1863, payable on the first days of January 1863, 1864, 1865, 1866, 1867 and 1868, respectively, and given by the said Charles to the said Armistead for the said last mentioned tract of land. ■
The controversy in this case is about the said 312 acres, 2 roods and 34 perches of land, and is between the said Edward K. Cooper on the one side, and those claiming the estate of Armistead Utterback on the other; the former claiming a lien upon it under the said deed of trust of the 5th day of July 1866, freed and discharged from the lien under the said deed of trust of the 2d day of February 1859; the debt secured by the last mentioned lien, having, as he insists, been paid and satisfied; and the latter, on the other hand, claiming a lien under the said deed of the 2d *237 day of February 1859, the debt secured by that lien not having, as they insist, been paid and satisfied.
The said note for $11,000 was given for $5,000, ney borrowed,- and eighty-five shares of hTavassa Phosphate Company’s stock, bought at $70 per share, by the said Charles H. TJtterback through the agency of Henry M. Willis, a property broker of Baltimore, from the said Edward K. Cooper. The parties to the said loan and sale were total strangers to each other at the time the negotiation of the transaction commenced, to-wit, in May or June 1866. At that time Charles H. Htterback came from his home in Fauquier county, Virginia, to the city of Baltimore, and proposed, through his said agent, to the said Cooper, to borrow the money and purchase the stock on the terms aforesaid, and to secure the payment of the amount which would become due on the transaction by a deed of trust on his said two tracts of land in the said county, which he represented as ample security for the said amount, after paying the only existing encumbrances upon the said land, which he represented as consisting of some judgments of comparatively small amount. Cooper replied that he “ would _accept the proposition, provided that on examination the property proved to besuffieient to secure the loan and purchase money and the title proved satisfactory to Mr. Bidgely,” the counsel of Cooper in Baltimore. Cooper “ sent James M. Basin to Virginia to report to” him “his estimate of the value of the property, and on his return was satisfied of its sufficiency in value. Mr. Bidgely in the meantime discovered that, in addition to judgments against the property, there was a deed of trust or mortgage to secure the payment of certain alleged indebtedness to Armistead Htterback.” The said Charles, “ on having his attention called to this, stated. *238 that it was only an apparent, not an actual indebtedness; that the said Armistead Utterback was his father, and was dead; that he, the said Charles H. Utterback, was the administrator of the said Armistead; that he had paid off all the other distributees of the estate and all the debts thereof, and only awaited the meeting of the court to have the account formally closed and the apparent lien released.” Cooper took him to said Ridgely, who was acting as the former’s counsel; “ Utterback returned to Virginia, and brought back with him certain papers, which he exhibited to Mr. Ridgely in confirmation of what he had said to” Cooper; “and the transaction was finally consummated.” The foregoing account of it is extracted from the deposition of said Cooper in the case. The following is extracted from the deposition, of said Ridgely, who, as the plaintiff’s attorney, was requested to examine the title and prepare the papers. “I applied to- Mr. Utterback for the title papers, and the information he had to communicate about the title. He produced to me a recorded deed to himself from his father, .and a certificate from Mr. Jennings, the clerk of Fauquier county court, showing the existence of several judgments against himself. He showed me also another deed for a small portion of the property adjoining his principal farm. He also stated that copies of the judgments, with the orders of the respective counsel to enter the same satisfied, were in the possession of the Farmers and Merchants Rational Bank; that it would take about $1,700 or $1,800 to pay off these incumbrances, and that was to be done out of the money to be received from Captain Cooper. I told him that the certificate was but partial, and that there was no certificate about deeds or mortgages given by him. He said that there was no other in *239 •cumbrance on tbe property, but the judgments of ■which he had given me a list. I told him that I could not pass the title without an examination of the land records, and that he must bring me a certificate from Mr. Jennings, the clerk, showing that there were no deeds of trust or mortgages. Reluctantly he acquiesced and submitted, and returned to Virginia to procure the necessary certificates.” “About the 5th of July he returned, and produced Mr. Jennings’ certificate, showing that he had conveyed the property by deed of trust in favor of his father to secure the payment of six notes of a little over $1,000 each, with the interest thereon. He explained the deed of trust as practically satisfied. He said that he had paid the three first notes, and took them up in the lifetime of his father, but that in the ups and downs of the war they had been lost. In regard to the other three notes he explained that they had been paid by himself as ■administrator of his father’s estate, and would be duly entered satisfied at the next term of the court. He also produced to me a certificate from the commissioner in chancery of Fauquier county” “confirming this statement, and that the property would be relieved from the lien of those notes mentioned in the deed of trust in favor of his father, Armistead Htterback, at the next term of the court. He said that he had more than paid to the other distributees of his father’s ■estate their proportion thereof, and was a creditor of the estate. He also produced a note to himself from his counsel, Mr. Brooke, in which he said that he sent him the deeds referred to in my testimony, and the certificate from the commissioner in chancery, and asked what more could Cooper’s counsel here in Baltimore require in consummation of the title; and on the faith of it all I passed the title. A deed of trust, *240 being that referred to-in the interrogatory, was executed to Mr. Easin, to secure the promissory notes mentioned in the interrogatory. The $5,000 was applied by me to the payment of the judgments against the estate, amounting to $1,686.57; broker’s commissions, my fee of fifty dollars, costs of stamps, and other incidental costs of the deed, were paid out of the fund, and the balance of $2,683.43 was paid to Utterback; and on the 26th day of July 18661 delivered to him eighty-six shares of said Uavassa Phosphate company, which* at the stipulated price of seventy dollars a share, produced $6,020, and he returned to me twenty dollars for Captain Cooper. The consideration for the promissory notes and deed of trust referred to, was the loan of the $5,000 by Cooper to Utterback, as heretofore explained, and eighty-six shares of ifavassa Phosphate company sold by Cooper to him.”
The commissioner’s certificate, referred to by the witness Eidgely, is in these words:
“ Commissioner’s Office, Warrenion, Va., July 2d, 1866.
This will certify that Charles H. Utterback, administrator of Armistead Utterback, has filed before me, as commissioner in chancery for the county court of Fauquier county, three bonds for $1,042.39 each, due respectively on the first day of January 1866, first January 1867, and first January 1868, as vouchers in the settlement of his administration account of said Armistead Utterback’s estate, and the said Charles H. Utter-back has directed me to credit the amounts of the said three bonds in his said administration account, as receipts which have come into his hands as assets of said estate, and the same will be entered in said ac *241 count as having been paid by said Charles H. Utter-bank to the estate of his said intestate.
Given under my hand, as commissioner aforesaid, the 2d day of July, 1866.
John W. Pugh.”
Under the above is a certificate in these words:
£< I, William A. Jennings, clerk of the county court of Fauquier county, do certify that' John W. Pugh is a duly appointed, authorized and acting commissioner in chancery of Fauquier county court, as such authorized by law to settle account of administrators and other fiduciaries, and that his signature to the above certificate is genuine.
Given under my hand this 3d July, 1866.
William A. Jennings, G. C.”
The note to Charles H. Utterback, from his counsel, Mr. Brooke, referred to by the witness Ridgely, is in these words:
“Warrenton, July 4, 1866.
Dear Charles:—I enclose you the deeds from Saunders & Schanot, Mr. Pugh’s certificate, to which is added the clerk’s certificate of your qualification, and his certificate about Saunders’ debt. You have already his certificates of all the judgments, and I do not see what -you need further to show your title. You must stamp the deed, and cancel them by writing the initials of the name and date of the deed. Saunders’ deed will take four dollars, and Schanot’s will take fifty cents. ■ The justice’s certificates and the clerk’s certificates ought also to have five cent stamps *242 Cached. I have no stamps on hand, but you can buy them.
Yours,
James V. Brooke.”
The administration account of Charles H. Utter-back on the estate of his father, Armistead Utterback, was never in fact settled by commissioner Pugh, because the said Charles H. countermanded the direction he had given to said commissioners in regard to said settlement, and withdrew the papers he had left in his hands for that purpose, especially his last three bonds to his father for the purchase money of the land, which bonds he afterwards handed to the administrator de bonis non of his father. And the said Charles H. Utterback having made default in the payment of such of his said notes to E. K. Cooper as had become payable, except the one for the first semiannual interest, which became payable six months after date, the said Cooper, in February 1868, instituted this suit for redress. In his bill, filed at March rules 1868, he stated the facts of the case on which he relied, made Charles H. Utterback in his own right, and as former administrator of Armistead Utterback, deceased, Charles T. Green, administrator de bonis non of said A. Utterback, R. W. L. Rasin, and W. H. Gaines, administrator of John P. Phillips, deceased, defendants to the bill, and prayed for a decree for the sale of the said land, for the payment of the debt due to him as aforesaid, and for general relief. Various proceedings were afterwards had from time to time in the said suit, including the following, which alone are material now to be mentioned, though some of the others may be hereinafter noticed.
In April 1868, the defendant, Charles T. Green, *243 ¡administrator d. b. n. of A. Utterback, filed Ms answer, in which he not only claimed the said three bonds which had been handed to him by C. H. Utter-back as still remaining due and unpaid to the estate •of A. Utterback, but insisted that the other three, ■alleged by the complainant to have been long since paid, were in fact wholly unpaid.
On the same day, to wit: on the 18th day of April 1868, Louis Shumate, Robert E. Utterback, and Addison W. Utterback, sureties óf C. H. Utterback as administrator of A. Utterback, on their petition, which they filed by leave of the court, were admitted as parties defendant in the cause.
On the 17th of April 1868, O. H. Utterback filed his answer, in which, among other things, he stated that the money loaned by complainant to him was not the sum of $11,000; on the contrary he averred s‘ that all the money loaned by the said complainant was $4,980, and that the balance of the consideration of said bond consisted of 86 shares of Eevassa Phosphate stock, fraudulently represented to this respondent to be saleable in the market at the rate of 55 per cent, (per share), and which this respondent, under this representation, was induced to take at 70 per cent. (per share), making for the 86 shares, the sum of $6,020, which, with the above sum of $4,980, constituted the consideration of the said note of $11,000.” Respondent charged that “ said E. K. Cooper was a party to these false representations, and was himself connected with the said Eavassa Phosphate company. This respondent was not a dealer in the stock market, •and had no use for Eavassa Phosphate or any other ■stock, except as a means of raising money, which he needed; and finding it impossible to procure the loan of money, even on the most undoubted security, with *244 out submitting to some extortion, he voluntarily agreed to shoulder the loss between the 70 per cent, which he-for the stock, and the 55 per cent, represented as its market value. This respondent did not dream however that he was duped so egregiously as he was, until, upon trial, he ascertained that the highest price he could obtain in the market for said stock was 26-per cent:, and at this price he was compelled to sell” &e. “It will thus appear that this respondent only in fact received (either in money or value,) the sums of' $4,980, $2,236, in all $7,216; and that this was all which the plaintiff gave for this respondent’s note of' $11,000; and this respondent, insisting that the said transaction is not only tainted with fraud, but also with usury, relies as fully upon both said grounds of' defence as if fully and specially pleaded.” “ This respondent admits, as stated in said bill, that at the time of the pendency of negotiations of said loan, his real estate was encumbered by a deed of trust executed by him to John P. Phillips, to secure six several bonds executed by him to Armistead Utterback, only three of which were due, the rest having been discharged.” “His real estate was also encumbered by several judgments for a large amount, and these incumbrances, this respondent was required to remove. With this view this respondent did consult his counsel named in said bill, and under the advice of said counsel proceeded as follows: With regard to the judgments, he made arrangements with the creditors that the amount of their respective judgments should be deposited to their credit in a Baltimore bank, and that when this was done the judgments, should be considered as discharged. This plan was adopted, and the judgments satisfied” out of the $4,980 aforesaid. With regard to •the deed of trust, this respondent supposed that, as a *245 -debtor, he had a right to pay the debt he owed his father’s estate, and being the administrator of that estate, he could pay no one but himself, and could pay ’ r J himself as administrator only by giving the estate credit in his administration account. He accordingly laid his papers before the commissioner, as stated in said bill, and directed the commissioner to charge him as administrator, with the amount of said three outstanding bonds in an account to be settled by said commissioner.” “This respondent then believed, and now believes, that when he laid his accounts before the commissioner for settlement, directing himself to be charged as administrator of the estate of A. Utter-back, deceased, with the debt he owed as aforesaid, he was doing what he had the right to do, and that the effect thereof was to discharge the lien of the deed of trust given to secure said debt; and if a different result has followed, it has not been through the agency or by the direction of his said counsel, but in consequence of the loss aforesaid, and the consequent defeat of his plans and purposes.” Respondent also made a statement in regard to the receipts for $1,000 each, given to him by three of the distributees, but it is unnecessary to set out the same here.
Ho tice having been given by the plaintiff of a motion for a receiver in the case, and sundry depositions taken and filed in reference thereto, a decree was accordingly made for such an appointment on the 24th of April 1868, and the said C. H. Utterback was in-joined from committing waste of the said land.
Many depositions were taken in behalf of the plaintiff, and were filed in September 1868; all of them were taken in Baltimore, and of persons residing there, except that of commissioner Pugh, which was taken in Pauquier county, where he resided. Among *246 the persons examined as witnesses in behalf of the-plaintiff were, H. M. Willis, the person who as agent-for the defendant, G. H. Utterbaek, proposed and negotiated the loan and purchase aforesaid; James M. Rasin, who, as said plaintiff’s agent, went to Fauquier to examine the land proposed to be conveyed and report upon its value; R. W. L. Rasin, trustee in the-deed executed by O. H. Utterbaek to secure the said debt to E. K. Cooper; the said E. K. Cooper himself;Charles W. Ridgely, the counsel of said Cooper, to-whom was referred the question of title to the property-proposed to be conveyed for the security of the debt,, and who, as counsel and agent of the plaintiff, carried-his arrangement aforesaid with C. H. Utterbaek into effect; and S. Teakle Wallis, who, as a legal expert, testified as to the law of Maryland on the subject of usury. Only one person was examined as a witness-in behalf of the defendants, and that was the defend-' ant C. H. Utterbaek himself. It is unnecessary, at least for the present, to state any part of the testimony of any of the witnesses or of the substance thereof;but so much of the same as mfiy be necessary to be-noticed in this opinion will be noticed therein hereafter.
On the 9th of September 1868, Robert E. and A. W. Utterbaek, two of the sureties of C: H. as administrator of Armistead Utterbaek, and also two of the children and distributees at law of said Armistead, filed their answers; and on the 17th day of the same month Lewis Shumate, the other surety of the said administrator, filed his answer.
On the 18th of September 1868 the cause came onto be heard; when the court, without deciding any other matters involved in the cause, decreed that an issue be made up and tried on the common law side- *247 of the court, before a jury to be impannelled therefor, to ascertain: First, whether the consideration of the note of $11,000 aforesaid was a loan from the said Cooper to said Utterback, and, if so, whether said loan was upon a consideration usurious in law; and, secondly, whether, if the jury find that the plaintiff sold to the said Charles H. Utterback, on the 5th day of July 1866, eighty-six shares of Navassa Phosphate stock, and that the purchase money of the said stock entered into and formed a part of the consideration of said note of $11,000, there were any false representations or.fraudulent devices upon the part of the said plaintiff, by means whei’eof the said C. H. Utterback was induced to become the purchaser of said stock, and, if so, to what extent the said C. H. Utterback hath suffered damages by reason of said false representations or fraudulent devices; in which issues the said Utter-back shall have the right to open and conclude.
On the 1st of October 1870 another decree was made in the cause appointing commissioners to sell the land in controversy.
On the 10th of November 1870 a copy of the verdict rendered by the jury upon the issue ordered in the cause was filed, from which it appeared that the said verdict was as follows: “We, the jury, find, first, that the consideration of the note for $11,000, executed by the defendant Charles H. Utter-back to E. K. Cooper, the plaintiff, dated 5th July 1866, and payable two years after date, and secured by deed of trust from said Utterback to 11. W. L. Ra-sin, of date of 5th July 1866, was a loan of money and sale of stock by said Cooper to said Utterback, and that said loan was upon a consideration not usurious .in law; we further find, secondly, that there was no false representations or fraudulent device on *248 the part of the said E. E. Cooper, the said plaintiff, by means whereof the said Charles H. Utterback was induced to become the purchaser of said stock called PTavassa Phosphate stock; and that said Charles H. Utterback has suffered no damage by reason of any representation or device of said E. E. Cooper. J. W. James.”
And it further appeared that the court, being satisfied with said verdict, ordered the same to be certified to the circuit court of Fauquier county sitting in chancery.
And it further appeared that afterwards, during the . same term at which said verdict was rendered, a motion was made by the defendants to set it aside for misconduct of the jury; which motion was overruled; to which ruling of the court a bill of exceptions was tendered by the defendants and made a part of the record by the court.
On the 23d of September 1871 the cause came on to be heard, on the papers formerly read and the receiver’s report returned on the 2d of March 1870 and the verdict of the jury aforesaid. “On consideration whereof, and for reasons contained in a written opinion of the court, then filed and ordered to be made a part of the record in the cause, the court, being of opinion, in accordance with the verdict aforesaid, that there was no fraud or usury in the contract between the plaintiff and the defendant Charles H. Utterback, and that under the circumstances shown by the evidence in the cause the debt due by Charles H. Utter-back to Armistead Utterback in the lifetime of the latter, and secured by the deed of trust of the 2d February 1859, became assets in the hands of the said Charles H. Utterback upon his qualification as the administrator of the said Armistead Utterback deceased *249 (the court not expressing any opinion upon the question as to whether the said Charles H. TJtterback did or did not pay any portion of said debt to the said x ^ vx. Armistead TJtterback in his lifetime); and being further of opinion that upon the debt aforesaid so be-r • f ^ coming assets in the hands of the said Charles H. TJtterback, administrator as aforesaid, the said deed of trust ceased tó operate or exist as a security therefor, and that the plaintiff is entitled to subject the real estate conveyed by the said Charles H. TJtterback to -Robert W. L. Rasin by his deed of trust of the 5th day of July 1866 to the satisfaction and discharge of the debt thereby secured;” decreed that said receiver’s report be confirmed, and that one of the commissioners of the court take an account of the amount then due to the plaintiff of the debt secured by the deed of trust aforesaid, and make report to the court.
On the 29th of March 1872 commissioner Pollock made a report under the last mentioned decree; on the 20th of April 1872 the commissioners appointed to sell the land in controversy made their report of said sale, showing that E. K. Cooper had become the purchaser of the land at $25 per acre, making the whole purchase money amount to $7,813.25, and that the purchaser had not been required by the commissioners to comply with the terms of the decree, as by the decision of the court he was entitled to receive the purchase money of the land; and on the day and year last aforesaid the cause came on to be further heard, when the court, without passing upon anything contained in the report of commissioner Pollock, ratified -and confirmed the sale of land to E. K. Cooper, as reported, there being no exception to said report of sale.
Afterwards Charles T. Green, administrator de bonis *250 non of Armistead Utterback, deceased, presented a petition addressed to the judges of this court, complaining of being aggrieved by the decrees and proceedings in the said suit, and praying for an appeal therefrom, which appeal was accordingly allowed by one of the said judges.
The only question in controversy in this case is, as-we have seen, whether Edward E. Cooper is entitled to the benefit of the lien of the deed of trust to Robert W. L. Rasin, of the 5th day of July 1866, on the three hundred and twelve acres, two roods and thirty-four perches of land in the proceedings mentioned,, freed and discharged from the lien under the deed of trust to John P. Phillips of the 2d day of Eebruary 1859, on the same land? In other words, whether thu debt provided for by the last mentioned deed has been paid and satisfied, or at least must be considered so to-have been, so far as concerns any claim of the said E., E. Cooper under the first mentioned deed?
My opinion is, that this question must be answered in the affirmative.
I do not consider it necessary in this case to decide’ the question, whether the qualification of Charles H. Utterback, as administrator of Armistead Utterback, deceased, ipso facto and proprio vigore, operated a payment and satisfaction of the debt due by the former to' the estate of the latter at the time of such qualification.
I think it very probable, from the facts and circumstances of this case, that the very and only purpose of Charles H. Utterback, in qualifying as administrator of his father, was thereby to extinguish the debt he owed to his father, or rather to discharge himself individually from liability for that debt, and to become-liable therefor in his character of administrator, so as- *251 to release the land from the lien of the deed of trust of the 2d day of February 1859, and to enable Charles H. Utterback to sell the land and convey a title to the purchaser free from that lien.
If such were the facts and circumstances, and there was no fraud in the transaction, I think a purchaser of the land from Charles H. Utterback would have acquired a good title against the lien of the said deed of trust of the 2d of February 1859, and especially as against the sureties of the said administrator, if they became such, as they probably did in this case, for the very purpose of promoting the object which the administrator had in view in becoming such, to wit: to free his land from incumbrance, and thus enable him to sell it; and especially also as against such of the distributees of the intestate as may have facilitated a sale of the land by the administrator free from the said incumbrance, as some of them seem in this case to have done by giving him receipts for large sums on account of their distributive portions of the estate, which receipts were to be exhibited to the purchaser.
But it is unnecessary in this case to decide even the question which would arise on the facts and circumstances as last supposed; for the case itself is infinitely stronger in favor of the purchaser than would be the case .supposed. In this case, not only is it probable that Charles H. Utterback qualified as administrator of his father, and his sureties as such joined him, to enable him to convey the land free from incumbrance; and that some of the distributees gave him receipts for $1,000 each on account of their distributive interests in the estate, for the same purpose; but also' the money was loaned by E. K. Cooper to Charles H. Utterback with the express understanding and agree *252 ment between them, that all prior incumbrances on the land, whether by judgment, deed of trust or otherwise, should be paid out of the said monev, as a . • v condition of the loan of it, and an amount of the said money more than equal to the whole amount of the said prior incumbrances, was actually paid into, the hands of the said administrator, who was in duty bound to apply the same to the payment of the said incumbrances; and therefore the said debt due by him to his intestate’s estate, and the incumbrance on the said land therefor, was then at least, if not before, fully paid and satisfied by Charles H. Utterback as an individual to himself as administrator of his father.
Eow in this case, it must be remembered, that there was no fraud on the part of E. E. Cooper in this transaction; nor any usury. As we have seen, the jury in this case, to which the present administrator de bonis non of Armistead Utterback was a party, so expressly found; and the judge who presided at the trial of the . issue, certified that he was satisfied with the verdict; and the court of chancery decreed accordingly.
The cause must, therefore, be considered precisely as if the whole amount of the note for $11,000 had been loaned in money by E. E. Cooper to C. H. Utter-back, and there had been no sale of stock by the former to the latter, in part of the consideration of the note.
Suppose such had actually been the case; could there have been any doubt, that the debt due by the administrator or individually to his intestate, would have been considered as paid and satisfied; at least so far as E. E. Cooper was concerned ? Could the sureties of the administrator or the distributees of the intestate, and especially those who signed the thousand dollar receipts, have doubted it? Could the *253 honorable counsel of C. H. Utterback who wrote to him the note of the 4th of July 1866, hereinbefore referred to and recited, have doubted' it?
The only ground on which a doubt has since been expressed is, that there was fraud on the part of E. E. Cooper in the sale of the stock, and that there was usury in the transaction. But both of these charges have been negatived by the verdict of the jury and the decree of the court; and the only ground of objection on the part of the defendants has thus been swept from beneath them.
Suppose commissioner Pugh had settled the administration account of Charles H. Utterback on the estate of his father, according to the papers and vouchers which were placed in his hands and the instructions which were given him by C. H. Utterback and his counsel, and the report of the commissioner had been confirmed by the court, could it have then been denied that the debt was paid and satisfied? And how would that case have differed in substance from the case as it is ? The settled account would not have been itself a payment, but only evidence, however strong, of the fact of payment. That fact, however proved, has the same force and effect.
That E. E. Cooper required the debt due by the administrator, C. H. Utterback, to his intestate’s estate to be paid; that the administrator positively agreed with E. E. Cooper to make such payment, as a condition of' the loan and sale made to him by Cooper; and that he derived from such loan and sale ample means to make such payment, are facts expressly proved in the case, and proved by the evidence of C. H. Utterback himself.
E. E. Cooper seems to have used an extraordinary degree of caution in the transaction. He was a total *254 stranger C. H. Utterback and his property and affairs; sent an agent to Virginia to examine the land; employed counsel in Baltimore to advise him as to the title, to prepare the papers, and to carry the w^°^e arrangement into effect. And he acted on the information, and with the assistance, thus received. And he acted in good faith, and without any fraud or usury. How then can it be said, that he is not entitled to the benefit of the lien for which he contracted?
Can it be said that he was bound to see to the application of the money which the administrator derived from him? Certainly not. An administrator is the legal representative of his intestate, and is entitled to receive, and bound to apply in a due course of administration, all debts due to the estate of such intestate, whether due by the administrator himself or any other person. Ho person who pays him the money is bound to see to its application. A person who participates in a breach of trust or devastavit of an administrator, is of course liable as the administrator is; but it is not pretended that E. K. Cooper was guilty of such a participation in this case.
That the debt in this ease was due by the administrator as an individual to himself as administrator can make no difference. Surely the administrator whose land was bound under a deed of trust to secure the payment of his debt to his intestate, had a right to pay off- his own debt and to redeem his land from the incumbrance, so that he might make sale of it. To' whom was he to make such payment? To whom but himself, who was the only legal representative of the creditor? How is a vendee from him to acquire title to the land .but by stipulating with him that so much •of the purchase money as was necessary should be *255 applied to the payment of the debt, and by paying it to the administrator for that purpose. And if the administrator receives it with that understanding and.for that purpose, is not the debt paid, however the administrator may actually apply the money; unless, indeed, the person who pays it fraudulently participates in the misapplication, or at least has notice of an intention to misapply it when he makes the payment?
An administrator is a complete legal representative ■of his intestate, and has power, and is in duty bound, to settle the affairs of his intestate’s estate. Such a settlement, fairly made, is as conclusive as if made by the intestate himself in his lifetime.1 Though the administrator make such a settlement with intent to misapply the funds of the estate, and actually misapply them, those who deal with him are not liable for such misapplication, unless they participate therein, or have notice thereof. It is contended by the counsel of the appellant, that all six of the bonds of Charles H. Utterback to his father, secured by the deed of trust to Phillips, remained unpaid when the money was borrowed by Charles H. Utterback from Cooper. The said Charles proves that only the last three of said bonds remained unpaid, and those only were handed by him to the appellant as administrator de bonis non of Armistead Utterback. This proof is conclusive of that fact; but if it were not, Charles H. Utterback, while he was administrator of his father, declared that such was the fact, and made his settlement upon that basis with Cooper, who acted fairly in the transaction, and advanced his money upon the faith of the truth of such declaration, which cannot therefore be now denied as to him. Charles H. Utterback had a-deed for the land from Armistead Utterback, subject only to the lien of the deed of trust to Phillips to secure the *256 bonds for the purchase money. Of course Charles H. Utterback had a perfect right to sell the land and a good title to the purchaser, subject only to the x ° payment of the prior lien to Phillips, and his only means discharging that lien was by selling or incumbering the land. He could discharge the lien only by paying the amount of it to the legal representative of his father, and he was himself such legal representative. He could therefore lawfully make such payment to himself as such representative, and could in fact only make it in that way. If he had borrowed the whole amount of the eleven thousand dollars mentioned in his bond in money, stipulating as he did with Cooper that the prior lien should be discharged out of the money borrowed, nobody can doubt that the lender would have acquired a lien on the land free from the incumbrance of the deed of trust to Phillips. But he realized from the transaction a sufficient amount of money to discharge the said incumbrance with all the other incumbrances on the land; and it was an express condition of the loan to him by Cooper that he should do so. Is not that precisely the same thing in effect as if the whole amount of the loan had been made in money, at least so far as concerns this case? There was enough loaned in money to pay the prior lien and a stipulation for such payment by the borrower. The whole amount of the loan, beyond what was necessary to pay the prior lien, belonged to Charles H. Htterback, who might receive it in such commodity and on such terms as he pleased, That is a matter between him and the lender, with which the estate of Armistead Htterbaek has nothing to do.
It seems to me that the foregoing views are conclu *257 sive of this case, and steer clear of most of the difficulties raised in the case by the argument of counsel. I am therefore of opinion that there is no error in' the decree and proceedings complained of, and that they ought to be affirmed.
The foregoing opinion was written some time ago, and was read in conference during the last term of the court, but a majority of the judges not concurring in it, Judge Staples, one of the majority, was charged with the duty of writing an opinion for them. His opinion was read in conference on Tuesday last, the day before yesterday, before which time I had neither seen it nor heard it read, nor heard anything of its contents. I have no doubt he prepared it as soon as he could, arid read it in conference as soon thereafter as he could. I do not complain, and have no cause to complain of him; and mention what I have just done only to show why I do not make more fully an explanation which his opinion seems to make necessary or proper in regard to mine. I did not ask to delay the decision of the case for the purpose, as it has already been very long delayed, but will now give the explanation as well as I can consistently with the pressure of my present engagements. But it must necessarily be brief and imperfect, though I may hereafter, if I have time before the case is reported, enlarge and try to improve it.
It will be observed that my opinion is based on the existence, among other things, of three facts which I think are fully sustained by the record; though I do not mean to admit, by any means, that the existence of all of them is necessary to the success of the appellee Cooper in this cause. Those three facts, with such *258 krief commentaries as I deem necessary, are as folloWS:
1st. There was no usury nor fraud in the transaction in the proceedings mentioned between Cooper and Charles H. Utterbaek. On the 18th of Septem- *■ ber 1868 a decree was made in the cause that an issue be made up and tried on the common law side of the court, before a jury to be empannelled therefor, to ascertain : first, whether the consideration of the note of $11,000, executed by the defendant Charles H. Utter-back to E. 3L Cooper, the plaintiff, dated on the 5th day of July 1866, and payable two years after date, and secured by deed of trust from said Utterbaek to R. W. L. Rasin, of date the 5th July 1866, was a loan from the said Cooper to said Utterbaek, and if so, whether said loan was upon a consideration usurious in law; and, secondly, whether, if the jury find that the plaintiff sold to the said Utterbaek on the 5th day of July 1866, eighty-six shares of Uavassa Phosphate stock, and that the purchase money of said stock entered into and performed a part of the consideration of said note of $11,000, there were any false representations or fraudulent devices upon the part of the said plaintiff, by means whereof the said Utterbaek was induced to become the purchaser of said stock; and if so, to what extent the said Utterbaek hath suffered damages by reason of the said false representations or fraudulent devices—in which issues the said Utterbaek shall have the right to open and conclude. In September 1870 the said issue was tried, and a verdict was found in these words: “We the jury find, first, that the consideration of the note for $11,000,” &c., describing it, “was a loan of money and sale of stock by said Cooler to said Utterbaek, and that said loan was upon a consideration not usurious in law; we further find, *259 •secondly, that there was no false representation or fraudulent device on the part of said Cooper by means whereof said Utterbaek was induced to become the purchaser of said stock, and that said Utterbaek has suffered no damage by reason of any representation or •device of said Cooper.” And the court, Judge Keith, being satisfied with said verdict, ordered the same to be certified to the circuit court of Fauquier county, ■sitting in chancery. On the 23rd of September 1871, the cause came on to be heard on the papers formerly read, &c., and the verdict of the jury aforesaid. On consideration whereof, and for the reasons contained in a written opinion of the court, filed and ordered to be made a part of the record in the cause, the court being of opinion, in accordance with the verdict aforesaid, that there was no fraud or usury in the contract between the plaintiff and the defendant Utterbaek, and that under the circumstances shown by the evidence in this cause the debt due by Charles H. Utter-back to Armistead Utterbaek in the lifetime of-the latter, and secured by deed of trust of the 2nd of February 1859, became assets in the hands of the said Charles, &c., and being further of opinion that thereupon the said deed of trust ceased to operate as a security for said debt, and that the plaintiff in entitled to subject the real estate conveyed by said Charles H. Utterbaek to said Easin by said deed of the 5th of •July 1866 to the satisfaction of the debt thereby secured, proceeded to decree accordingly. Uow it thus clearly appears that the fact that there was no fraud or usury in the transaction aforesaid between said Cooper and Utterbaek is res adjudicata, and cannot be •denied by any of the parties to this cause, as to' all of whom, therefore, it must be regarded as conclusive. I have therefore so treated it in the foregoing opinion.
*260 2dly. There was no intention on the part of Cooper in his transactions with' Charles H. Utterback to defraud or injure in any respect the estate of Armistead. Utterback. As said before, he and said Charles were perfect strangers when they commenced dealing with each other in this transaction, one living in Baltimore, and the other in Fauquier county, Va. Cooper, so far as appears from the record, was not anxious to make the loan, and declared his intention not to make it unless or until all the liens upon the land, if any, were discharged and released. He required proper certificates to be produced in regard to such liens; and all the judgment liens which appeared to* exist were-paid out of the purchase money. Hot satisfied with Utterback’s account of the matter, or even with the certificates thus produced, he employed counsel in Baltimore to come to Virginia and inquire into and-investigate the title. Upon ascertaining in that way the existence of the deed of trust to Phillips to secure a debt to his father, -Armistead Utterback, which deed was still on record unreleased, he enquired about it of said Charles, who assured him that the said debt was satisfied; that three of the bonds (one-half of the debt) had been paid to his father in his lifetime; that he was his father’s administrator, duly appointed and qualified, as was the fact; that he and his two brothers and a sister were the next of kin and. distributees at law of his father, and as such entitled to his estate-; that he had paid to his brothers and sister their portion, and; he exhibited a receipt of each of them to himself as-administrator on account of their distributive portions for the sum of $1,000; his two brothers being two of the three sureties in his administration bond; that he had placed his accounts and vouchers in the hands of a commissioner in chancery for the settlement of his- *261 administration account, with, directions to charge him in such settlement with the remaining bonds to his father, which he placed in the hands of said sioner for the purpose. And he produced and delivered to said Cooper a certificate from the commissioner, showing him that his representation in regard to such settlement was true, and that the commissioner would make • and return the settlement accordingly. And he also produced and delivered to said Cooper the letter, of which a copy is inserted in this opinion, from his counsel, Mr. Brooke, a lawyer of distinction of Virginia, perhaps well known by reputation, if not to Cooper himself, at least to his counsel. On the production of these papers, the counsel of Cooper in Baltimore did not hesitate to certify the title of TJtterback to the land, trusting, as well he might, that so soon as the settlement could be made and returned, the lien of the deed of trust to secure the debt to Armistead Utterback would be released. Accordingly the arrangement between Cooper and Charles H. TJtterback was made with the advice and under the direction of'the counsel of the former, and in accordance with the •opinion of the counsel of the latter. Uow in all this transaction certainly Cooper acted in the most perfect good faith, and without any intention to defraud or injure in any respect the estate of Armistead Utter-hack, and without any knowledge of any such intention on the part of Charles H. Utterbaek, if any such •existed. Charles H. being the complete personal representative of Armistead Utterbaek, had a perfect legal right to receive debts due to his intestate’s estate, and give acquittances for the same, even though due by himself, and all persons dealing with him in good faith must be perfectly safe in so doing, even though the administrator may himself have been guilty of *262 fraud iu regard to the estate, without any participation or knowledge on the part of such persons. If, therefore, Cooper was informed and verily believed either-that Charles H. owed nothing to the estate of his father, or that he owed nothing beyond the amount of money actually paid by Cooper to said Charles H.,. and that the account and vouchers of said Charles H., as administrator of his father, were in the hands of commissioner Pugh, for settlement, showing that the administrator had fully paid all that he owed to the-estate of his intestate, and that the report of the commissioner would immediately be returned to and confirmed by the court; and if the honorable counsel of the administrator certified that his title to the land was such, as that Cooper could safely purchase it from him, surely Coop.er was safe in making such purchase,, no matter what was the actual state of accounts between the administrator and the estate of his intestate. As between the administrator and Cooper, the land belonged to the former, and he could convey a perfect title to the latter. He could sell it to him on whatever terms he pleased.
Thirdly. But even if the debt due by the administrator to the intestate for the land should not be considered, as between the administrator and Cooper, as having been fully paid at the time of the sale by the former to the latter, an ample amount of the purchase money to make such payment was paid by the latter to the former, whose duty it was to apply it accordingly7 and it must be considered in law as having in fact been so applied, so far as the said Cooper is concerned. After making such application the surplus belonged to the administrator in his own right, who might invest it, or any part of it, in the purchase of stock of *263 the Uavassa Phosphate company, or anything else he pleased.
In every view of the case, therefore, I am of opinion that the law of it, and also the equity and justice of it, are for Cooper; and I am for affirming the decrees appealed from.
Staples, J.
This case was first heard when Judge Bouldin was a member of this court. His sickness and death, and a division of opinion among the other judges prevented a decision at that time. The case has again been argued very recently before a full bench. The argument on both occasions, oral and written, was able and exhaustive. I shall not attempt to follow the learned counsel in these discussions. Such an undertaking would swell this opinion into the dimensions of a volume; I propose only to discuss such portions of the evidence as may be deemed most material, and to state the principles of law which in my judgment control the case.
It may be well in the beginning, perhaps necessary, to state some of the more material facts established by the testimony, and as to which there is no controversy. In the year 1859 Armistead Utterback, of the county of Fauquier, sold and conveyed to his son, Charles Utterback, a tract of land in that county at the price of $6,254.34, evidenced by six bonds of $1,042.39 each, payable annually, the first falling due the 1st of January 1863, and all bearing interest from the latter date. To secure the payment of these bonds, Charles-Utterback executed a deed of trust upon the land, which was duly admitted to record. Armistead Utterback died in December 1862, intestate, but no administration was taken on his estate until the 25th September 1865, when Charles Utter- *264 back qualified as his administrator. It does not appear that he ever returned any inventory of the estate, or made any settlement of his accounts as administrator.
In May 1866, Charles Utterback went to the city of Baltimore to borrow money. He there met with Edward K. Cooper, the plaintiff, who after some negotiation, to be hereafter more particularly considered, advanced as a loan in money and stock the sum of eleven thousand dollars. In order to secure the payment of this sum, Cooper took a. deed of trust upon the same tract of land embraced in the trust deed Charles Utterback had previously executed for the benefit of his father. This loan as claimed by Cooper, was based not only upon the fact that Charles Utterback was administrator of his creditor, but upon certain representations made by him, and papers produced tending .to show that the debt due Armistead Utterback’s estate was satisfied, and the deed of trust discharged.
It may be well here to mention that in February 1867 Charles Utterback was removed from his office of administrator, and Charles T. Green was appointed administrator de bonis non of Armistead Utterback. The controversy in this case is between Cooper on the one hand, asserting the priority of his deed of trust, and the administrator de bonis non and the sureties of Charles Utterback on the other, claiming that the debt of Charles Utterback to his father’s estate has never been paid and the deed of trust in nowise released or affected.
The cause coming on to be heard at the September term, 1870, of the circuit court of Fauquier, the judge of that court was of opinion, that under the circumstances shown by the evidence, the debt due by *265 •Charles Utterback to his father’s estate became assets in the hands of the said Charles H. Utterback upon his qualification as administrator; and that upon the debt aforesaid so becoming assets in the hands of the said Charles H. Utterback, the said deed of trust ceased to operate as a security, and that Cooper, the plaintiff, was therefore entitled to subject the real estate embraced in the deed of trust to the payment of his debt; and he decreed accoi’dingly. From that decree an appeal was taken to this court.
The counsel for the appellee, in support of the decision of the circuit court, maintains, that when administration is granted the debtor upon the estate of his creditor, the administrator, being the person to pay and to receive, is considered as having paid the debt and as holding the amount in his hands as assets; and the debt having once become assets, no act of the party can return them back as an' obligation. The necessary result of all which is, the debt being gone, the security for its payment is also gone. That this position is untenable can, I think, be demonstrated both upon authority and upon principle.
At common law, the appointment of the debtor as executor operated as a release or extinguishment of the debt. Various reasons have been assigned for this rule. By some it is said that the appointment suspends the right of action, and, being once suspended by the voluntary act of the creditor, is gone forever. By other judges it has been said that the appointment is to be regarded in the light of a specific legacy to the debtor for the purpose of discharging the debt. But whatever may have been the reasons for the rule, the rule itself was subject to well established exceptions. For example, it never applied as against the creditors of the testator, unless there were sufficient *266 assets Pay the debts; because courts of equity would not permit the testator voluntarily thus to withdraw from his estate funds necessary for the payment of hisCr6ClitOF8.
The rule did not apply where a different intent was manifest on the face of the will, as where a distinct legacy was given by the same instrument to the executor. Lord Thurlow in Carey v. Goodinge, 3 Brown Ch. Cas. 110, and Sir Wm. Grant in Berry v. Usher, 11 Ves. R. 87, 90, held that the appointment of a debtor to be executor is no more than a parting with the action, and should not operate as a release even against legatees. It will thus be seen that courts of equity would not permit an extinguishment of the debt even in the case of executors; and I think there is as little doubt but that in favor of the creditors and legatees, they would when necessary keep alive and enforce-all liens given for its payment. The rule itself has-been long since abolished in Virginia by statute, and it is now provided, “ The appointment of a debtor executor shall not extinguish the debt.” Code of 1860, page 697. Ko such provision was made with reference to administrators because none was necessary. The granting of administration being the act of law, its acceptance by the debtor was never permittéd to work a release or extinguishment of the debt.
This distinction is recognized by the best authorities everywhere. In 2 Williams on Executors, page 1126, the doctrine on this subject is thus laid down: “It must be remarked that where the debtor is appointed executor, the suspension of the remedy is the voluntary act of the creditor, and therefore the action is gone forever. But the effect is different where the remedy is suspended by the act of the law. Thus if administration of the effects of a creditor be com *267 mitted to the debtor, this being the act of the law, is only a temporary privation of the remedy. Therefore if the obligor of a bond takes out administration to the obligee, and dies, the administrator de bonis non of the obligee may maintain an action for sucb debt against the executor of the obligor. In 1 Toller on Ex’rs 348, an author of acknowledged merit and accuracy, the same doctrine is laid down in language equally emphatic. I might quote to the same effect the unanimous decision of the court of common pleas, when Sir Edward Coke was chief justice, - Needham case, 8 Rep.; S. C., Browne 62, 64; also the opinion of Lord Hardwicke, the greatest of English chancellors, Hudson v. Hudson, 1 Atky. R. 460; 1 West R. Hardwicke 156, 7, 8; but I will content myself with a simple reference to these cases.
This precise question has not been adjudicated by this court; but we have in 2 Lomax on Ex’rs 100, and in Robinson’s Practice an unqualified approval of the English rule. In the last named work, the author quoting the authorities states: “But after the administration shall be no longer in force, either because of its repeal or of the administrator’s death, then an action may lie, for the debt has all along subsisted, and then there may be a proper plaintiff, viz: the administrator of the first intestate.” See also Kelsey v. Smith, 1 How. Miss. R. 68-86: Bacon v. Fairman, 6 Conn. R. 121.
In opposition to these cases, the learned counsel for the appellee has cited a number of decisions, or, rather, the dicta of certain judges. They are, however, confined to two or three states, principally Ohio and Massachusetts. In one of the Ohio eases, administrators are placed on the same ground with executors;. and the reason assigned is, that as the same hand is to *268 PaJ aD<^ receive: the right of action is suspended, and being once suspended is always suspended. Bigelow’s v. Bigelow’s adm’r, 4 Ohio R. 138. The learned court utterly misconceives the principle upon which aPP°in^ment the debtor as executor operated to extinguish the debt at common law. It was because the right of action was suspended by the voluntary act of the party. But as the granting administration is the act of the law, and as the law does not permit its act to work a wrong, the remedy is only temporarily suspended when the debtor becomes administrator. In regard to the Massachusetts cases, the learned counsel for the appellant has demonstrated that the opinions of judges there fully sustain both views of this question. A careful examination of the decision will show that neither Chief Justice Shaw nor Chief Justice Barker held to the view laid down in the Ohio case just'cited. The opinion of Chief Justice Shaw seems to have been, that as the same hand is to pay and to receive, the law presumes as against the debtor himself, that he has done that he was legally bound to do. The persons beneficially interested in the^ estate may require the administrator to account for his debt as assets, and to credit it in his administration account. They are not bound to do.so; they may, if they please, waive this right, and proceed upon the original security for the debt. Sigourney v. Wetherill, 6 Metc. R. 553; Goswick Man. Comp. v. Story, 5 Metc. R. 310; Stephen’s adm’r v. Gaylord, 11 Mass. R. 256; Winship v. Bass, 12 Mass. R. 194; Kinney v. Ensign, 18 Pick. R. 232.
In the state of New York they have a statute like ours, abolishing the common law rule in regard to executors; but it further provides, that the debt shall be included in the inventory among the credits and ■efiects of the deed, and the executor shall be liable for *269 the same as so much money at the time the debt be- " comes due.
In the recent case of Loverhill v. Suydam, 59 New York R. 140, decided in 1874, the court of appeals in construing this statute say, that when an executor in the performance of his trust pays the amount due from him to the estate, his debt and all the liens on his individual property, by which the debt was secured, will, of course, be discharged. But before this is done, it was not the intention of the legislature, while preserving the debt, to discharge the liens by which it might be secured. Subjecting the executor as between him and those interested in the estate to liability for his debt, as for so much money in his hands, does not necessarily discharge a lien on the real estate by which the debt may be secured. That provision merely superadds to his original obligation a liability to account as executor for the amount of the debt, and was intended to facilitate the administration, and for the benefit of the estate, and not for that of his individual creditors, who may have subsequent liens on the property.” In my judgment nothing could be more just, and sensible than the view here presented. Every word that is said applies with equal force to the case of an administrator. The Yew York statute made no-provision for the latter, not because it was intended to-place the administrator upon a higher ground than an executor, but because, as already stated, his appointment was never deemed a release or -discharge of the debt.
It is very true that an .administrator, while his letters of administration remain in force, cannot at law be sued for the debt, because in these courts a party cannot be both plaintiff and defendant. But I can see no good reason why those interested in the estate* *270 cre^tors an<I legatees, or distributees, cannot bring him to account, and enforce all the securities he has for the payment of the debt. Is it possible that such a case can ihsist that the individual debt is Pa^’ an<l the lien discharged by his qualification as administrator; that his sureties shall answer for a devastavit if he is insolvent; and if they are insolvent, creditors and legatees shall sustain the loss. But if on technical grounds there is any difficulty on this point, surely there is none where the. administration is revoked, and an administrator de bonis non has been appointed. In the language of Chief Justice Shaw, in Kinney v. Ensign, 18 Pick. R. 232, the holding the fact of a debtor taking administration upon the estate of a creditor to be a payment, may be deemed a legal fiction adopted for purposes of justice and convenience, but such a legal fiction will never be allowed to go so far as to work wrong and injustice.
It is the duty of a commissioner to charge the executor or administrator with all solvent debts due the estate, with or without direction. It is the duty of the executor or administrator to charge himself in such case. When the debt he owes the estate is well secured, parties interested in the estate may properly require he shall account for it as assets; and thus superadd to his individual obligation that of administrator. But the mere fact that the debt is credited in the administration account cannot destroy the original security given for the payment. That security will be kept alive by a court of equity so long as the debt is unpaid, particularly if the debtor has no other means of ■discharging the obligation. It would be most unjust to hold that the sureties upon the administration bond :are liable for the administrator’s debt as assets received whenever he charges himself with the debt, *271 and at the same time hold that all the securities which made the debt solvent are by the same act extinguished. In the case of Ipswich Man. Co. v. Story, executor, 5 Metc. E. 310, 314, a decision much relied on by the appellee, Chief Justice Shaw concedes that where the administrator has accounted for the debt as assets, and it is so credited to the estate without objection, yet if the administrator were to die or be removed from office before a decree of distribution or satisfaction of such decree, and it should turn out the administrator has no means to satisfy the amount due on his administration account, a court of equity might hold even in favor of the sureties on the administration bond, that a mortgage given to secure the debt should not be deemed to be discharged.
It is only remarkable there should ever have been any doubt upon the point. In the case of Smith v. Gregory, 26 Gratt. 248, this court expressed its entire disapprobation of the doctrine which accords to a fiduciary, at his pleasure, the right to change his liabilities, by charging himself in a particular character with a debt, and thus throw the burden on one set of sureties to the relief of another. A good deal of what is there said applies very strongly to the case under consideration.
Bearing these principles in mind, it may be affirmed with entire confidence, that when the negotiation with ■Cooper for a loan commenced in Baltimore, the debt which Charles H. Utterback owed the estate of his father, Armistead Utterback, was still subsisting as an individual liability, and the deed of trust given by him for its payment was in full force and effect. It is very true that Charles being the administrator of that ■estate, the right of action was temporarily suspended; but the obligation of the contract remained. "When, *272 *n ■^e^,ruary 1867, the administration was revoked and an administrator de bonis non appointed, the right of action revived, and all the remedies and securities for the deht were as complete as though Charles H. TJtterback had not been the administrator. This is so, indis- ‘ putably, unless in the meantime some act was done which operated as an extinguishment of the individual liability and a consequent discharge of the deed of trust. Conceding for the present that the acts done by Charles H. Utterback as administrator, it. bona fide done, would extinguish his individual liability and fix it upon him as administrator and upon the sureties to his official bond, it must also be conceded that these acts, if done mala fide, would have no such effect, even so far as Cooper is concerned, provided the latter had notice of the fraudulent purpose on Utterback’s part. In the language of Lord Thurlow, in Scott v. Tyler, 2 Dickens’ R., “fraud and covin will vitiate any transaction and turn it into a mere color. If one concerts with an executor by obtaining the testator’s effects at & nominal price, or at a fraudulent undervalue, or by applying the real value to the purchase of other subjects in his behalf, or in extinguishing the private debt of the executor, or in any manner contrary to the duties of the office of executor, such conduct will involve the seeming purchaser and make him liable for the full value.” But it must never be forgotten, it is not necessary that the person so concerting with the fiduciary shall have actual knowledge of the facts. If there be circumstances which in the exercise of common reason and prudence ought to put a man upon a particular inquiry, he will be presumed to have made that inquiry, and he will be charged with notice of every fact which that inquiry would give him. And this conclusion is a just and necessary one; for if a party means to deal *273 fairly, self interest, the strongest principle of action, will prompt him to the inquiry; and if he means to deal fraudulently, the rule prevents him from v • ... shutting his eyes and saying he had no notice. This is the doctrine laid down by this court in Graff v. Castleman, 5 Rand. 195, and affirmed over and over again in other cases. But further: I understand the rule to be, that if a man has notice that property is subject to an incumbrance, he deals with it at his peril; for he is affected with constructive notice of every fact to a knowledge of which he would have been led by an inquiry after the incumbrance itself, or other circumstance affecting the property of which he had actual notice. Kerr on Frauds and Mistake, 237, note.
How strongly these principles apply to the present case is now to be seen. Upon the arrival of Charles Utterback in Baltimore, in May 1866, in pursuit of money, he was told that Edward K. Cooper would accommodate him if he would take part of the loan in money, that is to say, $5,000, and the balance in the stock of the “Havassa Phosphate company,” that is to say eighty-six shares at $70 per share, the whole amounting to the sum of eleven thousand dollars. How what this Havassa Phosphate company was, what was its precise business, its capital stock, who were its stockholders, or when it was established, this record does not inform us. The only information we have is derived from Mr. Edward K. Cooper himself, or those in his interest. And he and they have not deemed it necessary to enlighten us upon these points. He tells us he was one of the executive committee, and originally owned 9,000 shares, of which he had sold five thousand. The greater part of which he had disposed of in connection with real estate—the owner or vendor receiv *274 a eertain- proportion in money and the balance in the “ Navassa Phosphate stock.” Indeed Mr. Cooper, according to his own account, seems to have been extensively engaged in buying and selling this stock in a Pr*vate way> never paying less than $45 nor more than $50 per share. A Henry M. Willis, who figured first as Utterback’s agent in negotiating the loan for Utterback, and afterwards as Cooper’s witness—and a most liberal witness he is—gravely tells us that in 1866 he believes he could have purchased one half the city of Baltimore, by giving that stock in part payment, on as favorable terms as Utterback took it. We have nothing in the record to show how much one half the city of Baltimore is worth, with its 400,000 inhabitants, and we can, therefore, only conjecture the magnitude of this calculation. And yet in the face of this assertion it is in proof, that whenever the stock was offered in market, the price varied from $26 to $35 per share. In but one single instance besides the present, was it ever sold for as much as $70 per share, and that was to a citizen of Virginia, who was anxious to borrow $10,000, but could only obtain the accomdation by taking oné-half in stock at $70 per share: a desperate expedient to which a needy borrower was no doubt forced to submit by inexorable necessity. To show the estimate Cooper himself placed upon the stock when Utterback was hawking his eighty-six shares about the streets of Baltimore, unable to find a purchaser, he offered it to Cooper at $55 per share; but the latter declined to have anything to do with it, saying he had as much as he wanted, and Utterback at last sold the whole of-it at $26 per share in the same market. What Cooper himself paid for the stock originally, he does not tell us. If it cost him as much as $50 per share, which is very improbable, he realized *275 by the transaction with Utterback a profit of nearly $1,800. It is not surprising he sent an agent all the way to Virginia, at his own expense, to examine the laud and “report whether it would be a sufficient security for the debt.”
I am aware that a jury empannelled in the circuit court to try an issue between Cooper and Utterback, have found that this transaction is not usurious. How sueh a verdict could have been found upon the evidence furnished by Cooper himself—I say it with all respect—does indeed excite emotions of astonishment. It is proved by the plaintiff’s own witnesses—it stands out indelibly impressed upon every feature of the transaction—that the purchase of the stock was a necessary consideration of the loan. However, it does not concern me to combat the finding of the jury on this point. . At all events it was a hard and most unreasonable bargain imposed upon an improvident and insolvent man, anxious to obtain money, reckless of the means by which it was obtained, and utterly indifferent to the consequences which might flow from his conduct.
The terms of the loan being agreed on, the next question was as to the security. Uttex’back represented himself as the owner of two farms in Virginia. He pi’oduced a recorded deed from his father for one of them. (The other does not concern us here, for although he had a deed for that also, he had not paid for it.) He also produced a certificate of the clerk, showing judgment liens on the property amounting to some $1,700 or $1,800. The certificate said nothing about deeds of trust and mortgages, and he declared there was no other incumbx’ances on the property besides the judgments. He made no allusion to the deed of trust he had given his father in 1859;. *276 he deliberately suppressed all information touching its-existence. This conduct was of itself sufficient to put Cooper on his guard. Of course if he, Utterback, was-so unscrupulous as to deny the deed, he would not hesitate to make any representation which might show' it was satisfied. Cooper did find out in some way there was such a deed, and he called TJtterback’s attention to the fact. Let us see how TJtterback met. the difficulty. I give his account in Cooper’s own words: “TJtterback, on having his attention called to-this (the deed of trust), stated that it was only an apparent not an actual indebtedness, that the said Armistead TJtterback was his father and was dead; that he, the said Charles TJtterback, was the administrator of the said Armistead; that he had paid otf all thedistributees of the estate, and all the debts, and only awaited the meeting of the court to have the account formally closed and the apparent lien released. TJtterback then went back to Virginia, and brought back with him certain papers, which he exhibited to Mr. Ridgley (Cooper’s counsel) in confirmation of what he-said to me.” The transaction was then consummated.
This is Cooper’s account. Now what were these papers brought back from Virginia by TJtterback in ' confirmation of what he had said ? First, the deed of' trust to his father. He also produced a certificate of his letters of administration, granted on the 25th September 1865; a private letter from his attorney, written in Fauquier, and a certificate of John W. Pugh, a commissioner in chancery for that county, as follows:.
“ Commissioner’s Office, Warrenion, Va., July 2d, 1866.
This will certify that Charles H. TJtterback, administrator of Armistead Htterback, has filed before me, as- *277 ■commissioner in chancery for the county court of Fauquier county, three bonds for $1,042.89 each, due respectively on the first day of January 1866, first January 1867, and first January 1868, as vouchers in the ■settlement of his administration account of said Armislead TJtterback’s estate, and the said Charles H. Utter-back has directed me to credit the amounts of the said three bonds in his said administration account, as receipts which have come into his hands as assets of said estate, and the same will be entered in said account as having been paid by said Charles H. Utter-back to the estate of his said intestate.
'Given under my hand, as commissioner aforesaid, the 2d day of July, 1866.
(Signed) John W. Pugh.”
How it will be observed that this certificate says •nothing about the payment of creditors and distributees. It makes no reference to the first three bonds embraced in the deed of trust, those due in 1863,1864, 1865. It only mentions the three last, those due in 1866, ’7 and ’8. What had become of the three first would be the natural inquiry? Utterback was ready with his answer. I give it in the words of Mr. Kidgley, Cooper’s attorney: “He said that he had paid the first three notes, and took them up in the lifetime of his father, but that in the ups and downs of the war they had been lost. In regard to the other three notes, ■they had been paid by himself as administrator of his ■father, and would be duly entered satisfied at the next term of the court. He said that he had more than paid to the other distributees of his father’s estate their proportion thereof, and was a creditor of the estafe.” ' This was his statement upon his second visit to Baltimore. It will be remembered that upon his *278 w^eri questioned as to the trust deed, he said nothing about the payment of the first three to his father in his lifetime; he never hinted at h;. His pretension then was, that he had paid all the crec^tors atld distributees, and that he would produce-satisfactory evidence of the fact, and thus show that the deed of trust represented only an apparent not an actual indebtedness.” Does any one suppose that these men, client and attorney, shrewd, sagacious,, thoroughly conversant with all business transactions,, were at all deceived by these statements, that they did not at once detect their palpable inconsistency? Is any one so credulous as to believe they did not see through the transparent device by which this man was seeking to use his office as a means of perpetuating a gross, fraud upon the estate he represented? Scarcely a word of his statement was true. He had not paid the creditors of his father’s estate. At that very time its liabilities exceeded $10,000. He had not settled with the distributees, or any of them, so far as the record shows. It is very trué that TJtterback obtained from two of the distributees receipts showing payments made to them;. but it is not pretended that any money was in fact paid, nor was Cooper ever misled, because he never saw the papers. He had returned no inventory of the estate; he had made no settlement. If he ever paid his father-the first three bonds, or either of them, he has nothing to show it except his own unsupported statement, and that is so improbable and contradictory as to deprive it of all claim to belief, even conceding he is a competent witness,
Armistead Utterback died in 1862 intestate; and we are to believe, without a word of proof, that at some period not stated Charles TJtterback actually paid three *279 bonds amounting to nearly $4,000 years before their maturity.
But this is not all. Throwing out of view all the contradictions and inconsistencies so palpable to any man of ordinary capacity, the statement in regard to the payment of creditors and distributees was not only unsupported by any proof, oral or documentary, but on its face was iucredible. He had qualified on the 25th September 1865; he was in Baltimore in May 1866. Within the short period of seven months he* a resident of a section still then suffering from the disasters of the war, had found all the creditors of the estate, and with his own private means had paid them, had overpaid the distributees, and had actually anticipated repayment of the bonds falling due in the years 1867 and 1868. And these statements, we are told, Cooper confided in and advanced his money on the faith of them. The thing is incredible. But if he did it was a blind and foolish confidence and he must lie, down under his own folly. He sent his agent all the way to Fauquier at his own expense to inquire into the value of the land—why did he not instruct him to inquire also into the condition of the deed of trust and the administrators accounts? Slight investigation, a little inquiry would have exposed the utter falsity of every material representation made by Charles TJtterback. If the certificate of the commissioner had stated the administrator had laid vouchers before him showing payments to creditors and distributees, or the payment of the three bonds, there might have been some reason for giving credence to such a statement, but it says nothing of the kind. He has directed me (says the commissioner) to credit the amount of the three bonds in his administration account as assets received, and the same will be entered *280 in said account as having been paid by said Charles H. Utterbaek to the estate of his said intestate. One cannot but be struck with the conclusion reached in this certificate from the premises stated. There is no pretence or intimation, that any money has been actually paid; but a direction having been given to credit the bonds as assets, they will be entered in the accounts as having been paid. Eo intelligent mind could fail to comprehend at a glance what was intended. A scheme, under the forms of law, by which the debtor released his property from a perfectly valid lien, without paying a dollar, commits a devastavit to the irreparable damage of his sureties, or creditors and distributees, and thereby obtains a loan upon the security of the same property, with which to indulge his passion for the frivolities and luxuries of a gay life in a city, while the party concerting with him reaps a profit of nearly $1,800, and the brokers, agents and attorneys, around him, pocket fees and commissions to the amount of between six and seven hundred dollars. And thus a fiction of law, which, in the language of Chief Justice Shaw, has been established for purposes of justice, was to be used as an instrument for the infliction of a great wrong upon innocent parties. If this is not a just inference, why was not proof requh’ed of the payment of the first three bonds, of the payment to creditors and legatees? Why was not the settled accounts called for? They had been promised, and the trip to Virginia was made to procure them. Why were they dispensed with? The answer is, they could not be produced. But the same object could be readily effected in a different way. Charles Utter-back, the individual, could pay the debt he owed his father, and discharge the lien by charging Charles Utterback, the administrator, with the amount, and thus *281 all the impediments, in the way of a good title, be removed. It w7as but a scheme so to shape the administration account, as to throw upon the sureties, and if they were insolvent, upon creditors and distributees any loss that might accrue.a
There is no statute or rule of law which gives any -efficacy to the certificate of a commissioner in chancery. His duties and functions are pointed out. He receives vouchers and papers of the fiduciary; he publishes notice that all parties interested may appearand protect their interests. When he completes the settlement he then returns it to court, where it lies till another term, that a still farther opportunity of making their objections may be afforded those interested in the estate. If no objections are made it is then confirmed, and until so confirmed it has no sort of value, and even then it is only recognized as prima Jade evidence, liable to be surcharged and falsified. Here an effort is made, however, to give to a mere certificate of a commissioner in pais an efficacy not -even accorded to a recorded settlement.
It must be borne in mind that here no settlement of the accounts was made by the commissioner. Utter-back withdrew the three bonds which he had delivered to that officer, and afterwards turned them over to the administrator de bonis non. This is denounced as an act of bad faith towards Cooper. It may be so. But •if a fiduciary concerts with another to commit a fraud •upon an estate, a court of equity would scarcely interfere to compel a specific execution of the contract. A ■refusal to consummate a fraud would receive the commendation of that court rather than its censure. So far from compelling Utterback to complete the transaction, whatever may have been his motives in refu *282 sing, this court would interpose to prevent its consummation.
Before leaving this branch of the case, it is proper to advert briefly to the letter written by Utterback’scounsel. It is apparent that letter was a private one,, intended only for the eye of the client. Upon what representations it was based it is impossible to say, unless we could know the statements made by the client to the attorney, which the latter cannot of course- . disclose.
The counsel did not represent, nor profess to represent, the estate, nor those interested in it, but Utter-back alone in his individual capacity. He was called on to see to the preparation of certain papers in due-form, and the letter was a mere announcement to the-client that they had been so prepared and were enclosed. It misled no one, and could not have done so, unless, indeed, upon a proposition of law rather-hinted at than expressed. It certainly contained no statement of fact in the least calculated to produce a false impression. Cooper as perfectly understood the-whole transaction without the letter as with it, and the-use of it, under the circumstances, is but an attempt to give countenance to a scheme involving a gross-breach of trust.
It is said, however, and great stress is laid upon the point, that the object of Charles Utterback in negotiating this loan, in part, was to pay the debt due his-' father’s estate; that it was understood between him and Cooper the funds were to be applied first to the-discharge of all incumbrances upon the land; and at all events he had money in his hapds derived from the-loan sufficient to pay that debt, and if he did not so-apply it Cooper cannot be held liable for the misapplication, and the sureties to the official bond must *283 bear the loss. Each one of these propositions is, I think, susceptible of a satisfactory answer. It is very true that Utterbaek now tells us his intention was to pay all his indebtedness; but he further tells us, that this intention was based upon the reprensatations of Cooper that the stock would sell on market at the price of fifty dollars per share, and with this fund in connection with the money advanced, he expected to liquidate all his liabilities. It is very manifest, however, that this was an after-thought; and that he never at any time had any such intention. It is perfectly certain that Cooper himself never entertained any such idea. His pretension is that Utterbaek declared to him that the deed of trust was satisfied by payments to his father in his lifetime, and by the settlement of all the claims of creditors and distributees. Cooper could not therefore suppose that any part of the money was to be applied to a debt which he professed to believe was already settled.'
The amount of money to be advanced by Cooper was $4,980'—in round numbers $5,000. Erom this, however, was deducted the sum of $1,686.57, to satisfy the two judgments constituting liens on the land, and about $650 fees and commissions of brokers and attorneys, who assisted in negotiating the loan, so that the whole amount paid to Utterbaek was $2,688. What was to be done with this ? Let Cooper himself answer' the question. “He (that is, Willis, who professed to act for Utterbaek) said Utterbaek wanted the money, $5,000,” to pay off somé judgments against him, and the balance to improve his house, and convert it into-a summer boarding house. Another witness, Robert W. L. Rasin, a partner and agent of Cooper, and an officer'of the “Uavassa Phosphate company,” states in his deposition, that Cooper told Willis that he must *284 ascertain from Utterback, before he would consent to sell him the stock, whether he desired it for investment or sale. Willis returned, and stated that he, Utter-back, was willing to hold it as an investment, as the money he applied for was ample for all his purposes. Utterback himself afterwards came to the office and stated that he wanted the money to pay off certain judgments, which were the only liens upon his property, and of improving the property, and that the $5,000 which he had applied for would be ample for that purpose. Uow I ask with what propriety can Cooper claim that this money ought to have been applied to the debt due Armistead Utterback’s estate. But if every dollar had been applied in that direction it could not have paid one-half the debt.
But we are told there was the stock, the eighty-six shares, the proceeds of which might have been so appropriated. But this is all an afterthought. If Cooper himself is to be believed, if his witness and partner is reliable, one of the conditions imposed upon Utterback was that he should not sell the stock, but keep it as an investment; and the reason assigned was, that Cooper held large amounts of the stock, and was unwilling to have the value of it depreciated by permitting it to be sold to persons unacquainted with its value. How in the face of these developments, with what show of reason can it be claimed that Cooper thought, or had the ■right to think for a moment that the money or stock would be applied to the discharge of any incumbrances upon the land. But in saying this I do not wish to be understood for a moment as conceding that Cooper believed it was Utterback’s purpose to keep the stock. All this talk about the purchase of stock as an investment was a mere pretence, a device to cover the usury.' Cooper knew well enough that no citizen of Virginia *285 would go to Baltimore to buy Uavassa Phosphate stock at $70 per share as an investment. Upon the cross-examination he was forced to admit that in no other sale ever made by him had any such conditions been imposed on the purchaser. And notwithstanding his great anxiety, to prevent the depreciation of the stock by sales to persons unacquainted with its value, he permitted Utterback to sell his eighty-six shares at $26 per share.
That sale amounted to $2,210, froni which, of course, would be deducted commissions and other charges. But adding the whole amount to the $2,683 received in money would make an amount of about $4,800. The amount of Charles Utterback’s indebtedness to his father’s estate in July 1866 was about $7,500; so that the whole sum derived from Cooper and from the sale of the stock would not have paid the deed of trust by nearly $3,000. In this calculation I assume, of course, that Utterback had not paid the first three bonds in his father’s lifetime, as he represented. There is not a scintilla of evidence to sustain this pretended payment except the assertion of Charles H. Utterback himself. If a debt of $4,000, well secured and attested by bond and mortgage, may be defeated upon the testimony of the debtor himself after the death of the creditor, there is no safety under any kind of security. As has been already said, if Charles H. Utterback were a competent witness, his statement upon this point is improbable, contradictory, and unworthy of' credence. Por all the purposes of this investigation we must then assume that no part of the debt due Armistead Utterback was ever paid.
In Graff v. Castleman, 5 Rand. 195-207, Judge Carr, in alluding to the purchaser, said: “ He took a transfer of the trust property as security for money to be *286 ildvanced 1° the private trade of the executor, a trade having not the slightest connection with the estate of the testator, or the objects of the trust.” And so here I think it has been demonstrated that the money was loaned and the stock transferred for the individual use of the administrator; that the transaetisn had no connection whatever with the estate; and that the money would not be applied in any way for its benefit. And yet we are told, that as Utterback had the money in his hands derived from Cooper which he ought as an honest man to have applied to the debt due his father’s estate, that debt, in Cooper’s favor, must be deemed satisfied, although at the time he advanced the money he well knew it would not be so applied. This is certainly carrying the doctrine of the legal fiction beyond all precedent. If there is any proposition which ought to be regarded as settled law in Virginia, it is that a party concerting with an executor or administrator in a breach of trust, cannot claim credit for the money actually advanced by him. It is not for him to say the fiduciary ought to have applied the money to the purposes of the estate. When he aids him in any manner contrary to the duty of the ■executor, he takes upon himself all the hazards of a misapplication of the fund. All the cases, including Graff v. Castleman, 5 Rand.; Pinckard v. Woods, 8 Gratt. 140; Fisher v. Barrett, 9 Leigh 119; Cocke v. Minor, 25 Gratt. 246, and Jones v. Clark, 25 Gratt., 642, established that proposition. In Fisher v. Barrett the purchaser was informed that the bond belonged to the administrator, and was so informed as to justify him in believing it; and yet he was decreed to surrender the security. In the case of Jones v. Clark, 25 Gratt., all the authorities are re-viewed at great length by the president of the court, *287 and the result of all of them, as there announced, is: If a person buying a bond from an executor has good reason to believe that the executor intends to apply the proceeds of sale to his own use, and thus commit a devastavit, it is incumbent upon him to stay his hand until he can ascertain by regular inquiries that the sale is to be made for the purposes of the estate. In all such cases the party dealing with the executor does not gain credit even for the money advanced, but is decreed to surrender the securities and account for the full value of the property received by him.
It is very true that most of the decisions referred to relate to the sale of bonds or assets of the estate; but the same principle applies to any improper dealing with the assets, or to any case in which a person concerts .with an executor in a manner contrary to the duties of the office of executor or administrator. There can be no difference, upon reason or principle, between the case of an executor selling the assets for his own private purposes, and the case of an executor who seeks to destroy a lien he haB given for the payment of a debt due his testator, with a view to raise money for his own individual uses. In either case it is a fraud, and the person who participates with him stands on no higher ground than the fiduciary himself.
It is said, however, that the jury have found that Cooper was not guilty of any fraud in the transaction. The jury did not pass upon the question we are now considering—they were not called on to do so. They found that Cooper had not perpetrated any fraud upon Charles Utterback, which might well be, and yet both Utterback and Cooper combining to perpetrate a fraud upon the estate; and if not so combining, Utter-back himself perpetrating the fraud, and Cooper content to reap the benefit of it.
*288 Fraud is rarely the subject of direct proof. In general it can only be established by circumstances. If ever there was a case in which the circumstances and facts unmistakeably disclose the real purpose and design of the parties, and the true nature of the transaction, it is the case before us.
Satisfied as I am that Utterback’s sole object was to use his office of administrator in extinguishing his private debt and releasing the security for its payment, and upon the same property raise money for his own private purposes, and that Cooper had every reason to understand these designs, he can stand on no higher ground than Utterback, but must share the same fate.
Holding these views, I have not considered it any part of my duty to attempt an answer to the inquiries made by counsel in the course of the argument, how and when may an administrator pay his debt and release his land; how may he sell and convey a good title with a view to raise money and discharge the indebtedness? These questions do not arise in this case. It is not incumbent upon us to lay down rules for the guidance of fiduciaries, any further than is necessary to an adjudication of the matters in controversy. It is sufficient for us to decide this case and leave others to be decided as the occasion may demand. Tor the reasons stated I think the decree of the circuit court must be reversed.
Anderson, J., concurred in the opinion of Mon-cure, P.
Christian and Burks, Js., concurred in the opinion of Staples, J.
The decree was as follows:
*289 The court is of opinion, for reasons stated in writing and filed with the record, that the deed of trust executed by Charles H. Utterback on the 2nd day of February 1859, for the benefit of Armistead Utter-back, constitutes a subsisting valid lien upon the lands therein mentioned, and that the same has priority over the deed of trust executed on the 5th day of July 1866, for the benefit of Edward K. Cooper; and that the circuit court erred in holding that the said first named deed of the 2nd February 1859, upon the qualification of Charles H. Utterback, as administrator of Armistead Utterback, dee’d, ceased to operate, or exist, as security for the debt named therein. Therefore it is decreed and ordered, that the said decrees be reversed and annulled, and that the appellee Cooper pay to the appellant his costs by him expended in the prosecution of his appeal aforesaid here; and that the cause he remanded to the said circuit court, for further proceedings to be had therein in conformity with the principles of this decree.
Which is ordered to be certified to the said circuit court of Fauquier county.
Decree reversed.