# Richmond.

## THURSTON'S ADM'R v. SINCLAIR AND ALS.

### May 5, 1884.

GUARDIANS—*Payments to before appointment—Case at bar.*—Early in 1857, R. devised to W. real estate charged with payment of certain legacies, all whereof W. promptly paid, except one of $1,250 to the infant children of S. December 18th, 1857, W. paid this legacy to S. and took his receipt. April 3d, 1859, for slaves delivered by W. to S. under a decree rendered sometime before in a suit by S. as next friend of his children, and for balance of a residuary legacy to them then paid by W. to S., a receipt and a refunding bond were executed by S. to W. Neither the receipts nor the bond were signed by S. "as guardian," but in the last receipt and in the bond reference was made to S. as the guardian of said children. Later W. devised said real estate to E. and his personalty to his sister. After attaining their majority these children, claiming that S. was not their guardian on 18th December, 1857, and that the payment of the legacy by W. to S. on that day, was unauthorized, sued W.'s administrator for the payment thereof. The records of G. county, wherein the qualification of S. as such guardian should have been, were destroyed, much time had elapsed, the memory of S. had failed, and evidence was lost, &c.

HELD:

1. The established facts show that S. was the guardian of his children, though the time of his appointment is left uncertain by lapse of time, destruction of records, &c. Yet it is fairly inferable that he was such guardian when he received the $1,250 legacy.

2. If S. was not such guardian when he received that legacy, this money, by operation of law, became chargeable to him in his guardianship accounts, when he became guardian.

3. It was a debt due from himself individually, to himself as such guardian, and upon his qualification as guardian, *eo instanti* it became assets in his hands, the law treating it as paid to him as guardian. *Brown* v. *Lambert*, 33 Gratt. 256.

4. *Quære :* It is not necessary now to decide whether the real estate which had been devised by R. to W. and charged with the payment of this legacy, is chargeable in the hands of E., the devisee of W., before resorting for its payment to the personal estate of W. in the hands of his administrator.

Appeal from decrees of circuit court of Gloucester county, entered respectively November 23d, 1880, and May 24th, 1881, in two suits in chancery which were heard together under the style of *Rose & Wife* v. *William S. Thurston's Adm'r, &c.,* and *Nuttall* v. *Kemp's Adm'r, &c.*

The object of the first named suit was the settlement of the estate of William S. Thurston, deceased, and of that last named, to settle the estate of Wyndham Kemp, deceased, who had been the executor of William S. Thurston, deceased. From these decrees, Sands Smith, sheriff of Mathews county, and as such administrator with the will annexed of William S. Thurston, deceased, unadministered by said Kemp as such executor, and Sarah M. Rose, residuary legatee of said testator, obtained an appeal to this court. The opinion fully states the facts.

*J. B. Donavan* and *E. S. Brown,* for the appellants.

*T. G. Jackson, M. Jones, W. W. Woodward,* for the appellees.

RICHARDSON, J., delivered the opinion of the court:

The controversy in this case is as to the liability of the estate of Dr. William S. Thurston, executor of Robert Thurston, for a legacy of $1,250 to the appellees under the will of their grandfather, the said Robert Thurston, late of Gloucester. The facts are as follows: Robert Thurston died in the county of Gloucester early in the year 1857, the owner of valuable real estate situated in said county, and a number of slaves, with considerable other personal property. His will was admitted to probate the 3d of March, 1857. He devised to his son, Dr. William S.

Thurston, three of his tracts of land, charged with the payment of several pecuniary legacies, among them $1,250 to the four children of his deceased daughter, Mary E. Sinclair, namely: Robert M. Sinclair, John T. Sinclair, Henry F. Sinclair, and William E. Sinclair. Robert Thurston devised his other lands to his son, Edward T. Thurston. He directed his slaves to be divided into five portions, one of which portions he bequeathed to the said children of his deceased daughter, Mrs. Sinclair, and he gave them also one-fifth of the residuum of his estate. At the time of the death of Robert Thurston, the testator, these children of Mrs. Sinclair were infants—the oldest being some six years of age. Their father, John Sinclair, Jr., was living, and it is an undisputed fact that he qualified as the guardian of the appellees, his children, by his marriage with the said Mary E., the daughter of said Robert Thurston. But there is no record evidence of the precise time of his appointment and qualification as their guardian, from the fact that during the war, for safety, the public records of Gloucester county were removed to the city of Richmond, where they remained (Gloucester county remaining within the federal lines), until the evacuation of Richmond by the confederate authorities, when they were destroyed in the conflagration which then occurred in said city. Nor is there any other direct evidence as to when said guardian was appointed.

The legacies charged by Robert Thurston upon said land, devised to Dr. William S. Thurston, amounting to a very large sum, were promptly paid within a very short period, all things considered, after the death of said Robert, and the qualification of said William S. Thurston as his executor; and there seems to have been not the least dispute or trouble as to any, except this legacy of $1,250 to the children of Mrs. Sinclair, though the testator, while, in very explicit terms he charged said legacies upon the land, yet, with equal particularity, directed by his will that his son and devisee, Dr. W. S. Thurston, should not be required to pay said legacies until it should be convenient

for him to do so.   Within ten months from the period of his
qualification as executor, to wit: on the 18th day of December,
1857, William S. Thurston paid to John Sinclair, Jr., the father
of the children of Mrs. Sinclair, $1,250, the amount of the legacy
to said children, and took his receipt, which is signed in his
individual name, and not as guardian; and from the manner in
which this receipt is executed, comes the chief ground of dis-
pute in this case.   There is no question that Dr. Thurston paid
promptly all the other legacies charged upon the land devised
to him; nor is there any question that on the 4th day of April,
1859, William S. Thurston paid to John Sinclair, guardian of
his children aforesaid, the sum of $735.69, that being the entire
balance due them from him as executor of Robert Thurston, as
ascertained by Mr. Cary, a commissioner of accounts for the
county court of Gloucester county, and took his receipt therefor,
which, like the other receipt, is signed " John Sinclair, Jr.;"
but in the body of the receipt said children are described "my
wards."   It is also an unquestioned fact, as appears by a refund-
ing bond in the record, executed by said John Sinclair, Jr., with
Jefferson B. Sinclair as his surety, that the slaves assigned to
these children were delivered to John Sinclair as their guardian.
This bond, like the said receipts, is not signed by said John
Sinclair as guardian, but in the body thereof he is referred to as
the guardian of his said children.   The bond, in the condition,
among other things, recites that, " whereas by a decree of the
county court of Gloucester county, pronounced on the 7th day
of December, 1857, in the suit between the said Robert M. Sin-
clair, John T. Sinclair, Henry F. Sinclair, and the said William
E. Sinclair, suing by the said John Sinclair, Jr., their next
friend, complainants, and William S. Thurston in his own right
and as executor of the last will and testament of Robert Thurs-
ton, deceased, and others, defendants, it was adjudged, ordered
and decreed that partition of all of the negro slaves whereof the
testator, Robert Thurston, was possessed at the time of his
death, and of the increase thereof, if any, be made among the

parties to said suit according to the provisions of the last will and testament of the said Robert Thurston. But it was provided that none of the parties should take possession of the negro slaves assigned to them, respectively, under the said decree, until they, or some person for them, should execute and deliver to the said William S. Thurston, executor as aforesaid, bonds with sufficient security, conditioned to refund their due proportions of any debts or demands which might afterwards appear against the testator, and of the costs attending their recovery. And whereas, in the partition of said slaves made according to the said decree, the following negro slaves were assigned and allotted to the said R. M. Sinclair, John T. Sinclair, Henry F. Sinclair and William E. Sinclair." Such is a literal transcript from said refunding bond, and it contains all that is said in reference to said decree of the 7th day of December, 1857, and what had been theretofore done under and by virtue of the same; but when that partition really took place does not appear, further than that it had taken place prior to the execution of said refunding bond, which is dated April 3d, 1859.

The refunding bond then proceeds to give the names of the several slaves assigned to said Sinclair children, with the value of each, amounting in the aggregate to $——. Said bond further sets forth that "all said slaves have been delivered by said Wm. S. Thurston, executor as aforesaid, to the said John Sinclair, Jr., as guardian as aforesaid:" and further recites the payment by said executor to said guardian of said sum of $735.69, the distributive portion of said Sinclair children, of the estate of said Robert Thurston, though the receipt for said sum bears date one day later than the date of said refunding bond.

Dr. Wm. S. Thurston resided at Mathews Courthouse. The estate of his father was being administered in Gloucester county, and Dr. Thurston seems to have transacted much of the business through his friend and legal adviser, Mr. Wyndham Kemp, who resided at Gloucester Courthouse. A commissioner of

accounts (Mr. Cary), had settled the executorial account of Dr. Thurston as early as the last of March, 1859, showing the balance due by him as executor. Of the completion of this work by said commissioner, Dr. Thurston had no knowledge until the 31st day of March of that year, when his attorney, Mr. Kemp, informed him of the fact by letter, and that the whole balance due from him as executor was $3,678.45, and that each distributee would be entitled to $735.69. In reply, Dr. Thurston wrote to Mr. Kemp, April 1st, 1859: "I intended to be at Gloucester Courthouse next Monday, but having on hand at this time three or four very sick patients with pneumonia, I fear it will be entirely out of my power to attend. I write to request that you will pay over to John Sinclair, Jr., as guardian of his children, or his legally authorized agent, the portion due his children, after deducting his purchases, if any, at the last sale, and his part of any accruing costs; also to Mr. Charles C. V. Waller, his part, after deducting his part of the accruing costs; that is, if there be sufficient funds of the estate in your hands to do so. * * * If you can think of it, I will be much obliged to you to take a proper receipt from John Sinclair, for the amount I paid him some twelve months since—the $1,250, I mean—also his refunding bond. I think I gave you the blank bond which I had prepared."

It is, as before stated, a conceded fact that John Sinclair, Jr., was the guardian of his said children, though when he was appointed does not appear, and that Jefferson B. Sinclair was his surety. On the motion of his said surety, at the May term, 1860, of the county court of Gloucester, a new guardianship bond was required, and John Sinclair failing to give it at the succeeding December term, 1860, his powers as guardian were revoked, and then in his stead Fayette Sinclair was appointed guardian, and Jefferson B. Sinclair became his surety.

In February, 1861, Dr. Thurston died, and his will was recorded the 11th day of March, 1861. The lands devised to him by his father, he devised to his brother, Edward T. Thurs-

ton, for life, with remainder to his children. He bequeathed his slaves and certain pecuniary legacies to different relatives, including said children of Mrs. Sinclair, to each of whom he gave $500, and directed his executor to invest the residue of his estate in stocks, the interest or dividends to be paid to his sister, Mrs. Rose, during her life, and at her death the stocks to be delivered to her children. And by his will, Dr. Thurston appointed his said friend and legal adviser, Mr. Kemp, his executor. Kemp, executor of Dr. Thurston, soon died; thereafter came the two suits before mentioned, of *Rose and Wife* v. *Thurston's Adm'r*, (who was after Kemp's death, Sands Smith, sheriff of Mathews county), *Nuttall* v. *Kemp's Adm'r*, in the circuit court of Gloucester county, in which the estate of Dr. Thurston was being administered, and in the first of which, on the 24th day of May, 1861, the children of Mrs. Sinclair filed their petition, alleging they had heard that Dr. Thurston had paid their legacy of $1,250 to their father, the said John Sinclair, Jr., and, if so, he paid it in his own wrong; that he was not their guardian, and that he was utterly insolvent; and they prayed that Dr. Thurston's administrator be required to pay to them the $1,250, with interest thereon. This petition was filed long after said children had attained their majority.

The matter was referred to a commissioner, who reported that Dr. Thurston paid the legacy of $1,250 to John Sinclair in his own wrong; that John Sinclair was not guardian at the time of the payment, though he became so afterwards; that the children of Mrs. Sinclair have now a valid claim against the administrator of Dr. Thurston for this legacy, and interest thereon; that, as between Edward T. Thurston, the devisee of Dr. Thurston, and his legatees, Mrs. Rose and her children, the personal estate is the primary fund for the payment of said legacy of $1,250. This report was excepted to by the appellants, the exceptions overruled, the report confirmed, and a decree was entered in accordance with said report, holding that John Sinclair, Jr., was not the legal guardian of his children

when he received said legacy from Dr. Thurston, though he became such afterwards, and that they have a valid claim for said legacy against the estate of Dr. Thurston, and adjudging that the administrator of Dr. Thurston pay to Robert M. Sinclair, John T. Sinclair, Henry F. Sinclair, and William E. Sinclair, the children of Mary C. Sinclair, $1,250, with interest thereon from the 3d day of March, 1858. From the two said decrees the cause is here on appeal.

The appellants, the administrator of Dr. Thurston and Mrs. Rose, assign the following errors:

I. In holding that, on the 18th of December, 1857, when Dr. Thurston paid the legacy of $1,250 to John Sinclair, Jr., he was not the legal guardian of his children.

II. In holding that, if he was not their legal guardian, he did not become chargeable with this money in his guardianship account when he afterwards qualified as their guardian.

III. In holding that, if this legacy had never been paid as between the devisee of Dr. Thurston of the land charged with it, and his legatees, his personal estate is the primary fund for its payment.

IV. In holding that, if Dr. Thurston had not paid the children of Mrs. Sinclair the legacy of $1,250, his legacy to them of $2,000 was not satisfaction thereof.

In the view of the case taken by this court, it is only necessary to consider the question raised by the first and second assignments of error; if, in fact, it be necessary to do more than consider and pass upon the first of said assignments.

1. Was John Sinclair the legal guardian of said children on the 18th of December, 1857, when it is conceded he received said legacy? If from the facts and circumstances disclosed by the record this question can be affirmatively answered, then the case is at an end, and the decree of the circuit court must be reversed.

To repel the validity of the payment of this legacy by Dr. Thurston to John Sinclair, as guardian, on the 18th of Decem-

ber, 1857, there is only the one important circumstance, that the receipt of that date is not signed as guardian ; but, in this respect, every paper signed by said Sinclair, so far as disclosed by the record, is signed in the same way.    This is true, notably, in respect to the receipt for $735.69, and the refunding bond, both of which were executed in April, 1859, when it is admitted and proved that he was the guardian.    In fact, he seems to have had a perverse fondness for signing his name "John Sinclair, Jr."    Let us then look carefully and ascertain what the evidence establishes, remembering that the transactions we are examining into occurred very many years ago, and running into a period of war and general devastation; that this particular section of country, where these things transpired, became at the very commencement of the war under the control of invading armies, and so remained during the entire period of unfortunate and destructive war; that almost every vestige of the public records were destroyed; that every party and witness to these transactions is dead, except the palpably derelict guardian himself; and that when he is introduced as a witness he first positively swears that he was never the guardian of his children, but when confronted with evidence to the contrary, he admits that he was guardian, but was appointed such at a period subsequent to his receipt for the $1,250, the legacy of his children, and excuses himself upon the ground of "bad memory"

A very important circumstance tending strongly to establish the fact that John Sinclair, Jr., was guardian when Dr. Thurston, paid him the $1,250, is, that a suit was brought in the county court of Gloucester in the same year, and at the utmost only a few months after the death of Robert Thurston, for partition of the negroes disposed of by the will of said Thurston. This suit was prosecuted by John Sinclair, Jr., as the next friend of his children, who were under the will entitled to one-fifth of the whole, amounting in value to between nine and ten thousand dollars.    The suit thus brought and prosecuted, shows

the anxiety of John Sinclair to get into his possession the valuable property bequeathed to his children by their grandfather. The children were then of very tender years. They could have had no knowledge of or motive for the prosecution of this suit. It could have been done only at the instance of John Sinclair and with the view of benefiting himself. In this suit there was a decree for the partition of the slaves as early as the 7th day of December, 1857. This decree doubtless directed the negroes allotted or assigned to the Sinclair children to be delivered to their guardian, and it appears by the refunding bond before referred to, which contains the only reference we have to that suit, that they were delivered to John Sinclair, Jr., as such guardian. But for this refunding bond, which must have been taken some sixteen months after the distribution of the slaves, and over two years after the death of the testator, we would have no evidence, on account of the burning of the record, of the fact that there ever had been such a suit.

But it is most strenuously contended by counsel for the appellees that the slaves were delivered at the date of the refunding bond, in April, 1859. There is nothing, in point of fact, in the bond to warrant this contention, but the contrary. The bond recites, it is true, the payment of the $735.69, the balance due from Dr. Thurston as executor, which was doubtless paid at or about that time, and also the delivery to the guardian of the slaves assigned to the Sinclair children; but from the language used the fair, if not unavoidable inference is, that the negroes had been delivered prior thereto. The bond is witnessed by Wyndham Kemp, who was directed, as we have seen, by Dr. Thurston, to pay the $735.69 balance, and he did pay it as directed. But in Dr. Thurston's letter to Kemp, before referred to, there is not one word said about delivering negroes. A matter of such importance could not have been overlooked by a careful, prompt and upright business man, such as Dr. Thurston is shown to have been. There would, in the nature of things, have been something said as to where the negroes were,

in whose custody, and how to be gotten in possession for the purpose of delivery.

Again, Robert Thurston died early in 1857; when not required for the payment of debts, negroes were required by law to be distributed within a year after the qualification of the executor. This, then, would have made the latter part of the year 1857 the true time for the distribution of the slaves, and we must conclude they were then distributed. Why so. 1st. It is next to incredible that John Sinclair, who was so eager to get possession of the negroes coming to his children, as to bring a suit to effect that purpose so very soon after the testator's death, did not, at least as soon as the term of the court wherein said decree was rendered, clothe himself with power as their guardian to enable him to control them. 2d. It is not by any means probable that the court would have entered so important a decree without appointing a guardian to receive this large slave property going to infants. 3d. It being conceded and known from indisputable evidence that John Sinclair was the legal guardian at a period subsequent to said decree of distribution, and the destruction of the records making it impossible to determine exactly when he was appointed, and this being the chief difficulty, common justice and common sense alike force the conclusion that the county court of Gloucester, when it rendered its decree of December 7th, 1857, had performed its duty by providing a guardian to receive this large property in slaves and money, and that John Sinclair, Jr., was the man; that he was then the legal guardian of his children; that he thereafter, to-wit: on the 18th day of December, 1857, as such guardian, received from Dr. Thurston the legacy of $1,250 to his children under the will of their grandfather, Robert Thurston, and that the mere failure on the part of John Sinclair, Jr., to sign the receipt for the money as guardian is wholly insufficient to repel this conclusion, supported as it is by facts and circumstances which preclude a contrary conclusion.

The question upon which this case turns is purely one of fact,

and we are of opinion that the weight of evidence in the record is decidedly in favor of the conclusion arrived at.

In this view it is unnecessary to notice either of the other assignments of error, but to enforce the view above in respect to the second assignment of error, it may be said if John Sinclair was not guardian when he received the $1,250 legacy, when he afterwards became such, this money, by operation of law, was chargeable to him in his guardianship accounts. It was money had and received for the benefit of his children, and his successor might have maintained an action against him for it. When he qualified as guardian he was both debtor and creditor. These inconsistent relations existing, he could not be expected to sue himself. In this state of things the debt thus due from him to his children, became, on his qualification as their guardian, *instanter* assets in his hands. Thus owing a debt to his children, and becoming their guardian, the law treats the debt as paid to himself as guardian by himself as a debtor. It is said that upon this supposition the rule of equity depends, which makes an executor accountable for the amount of his debt to his testator as assets. Lord Tenterden, chief justice in *Freakley* v. *Fox*, 9 Barn. and Cress. 130, and a large number of authorities referred to by counsel for appellants, fully sustains this view. See also *Bryant* v. *Smith*, 10 Cushing (Mass.), 169. In such a case, the person to pay, and the person to receive, being the same, the court assumes that what ought to be done has been done, and orders the payment, not as a debt by a debtor, but as money realized in the hands of the executor. *Utterback* v. *Cooper*, 28 Gratt. 233; *Harvey* v. *Steptoe*, 17 Gratt. 289; *Farmer* v. *Yates*, 23 Gratt. 145; and *Brown* v. *Lambert*, 33 Gratt. 256.

For these reasons we are of opinion to reverse the said decrees of the court below, and enter a decree here dismissing the petition of the appellees, &c.

DECREE REVERSED.